NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-3262-15T4

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

JAMES A. STUART,

 Defendant-Appellant.
________________________________

 Submitted May 3, 2017 – Decided August 3, 2017

 Before Judges Accurso, Manahan and Lisa.

 On appeal from Superior Court of New Jersey,
 Law Division, Gloucester County, Indictment
 No. 13-09-0949.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Stefan Van Jura, Deputy Public
 Defender, of counsel and on the brief).

 Sean F. Dalton, Gloucester County Prosecutor,
 attorney for respondent (Douglas B. Pagenkopf,
 Assistant Prosecutor, on the brief).

PER CURIAM

 Defendant James A. Stuart was charged in a four-count

indictment with two counts of murder, one count of aggravated
manslaughter, and one count of possessing a firearm with the

purpose of using it unlawfully against the person or property of

another. These counts arose out of an incident in which there was

only one victim, David Compton, who was killed by a single gunshot

wound to his head. More specifically, the indictment charged:

Count One, purposeful murder, N.J.S.A. 2C:11-3a(1); Count Two,

knowing murder, N.J.S.A. 2C:11-3a(2); Count Three, aggravated

manslaughter, N.J.S.A. 2C:11-4a; and Count Four, possession of a

firearm with purpose to use it unlawfully against the person or

property of another, N.J.S.A. 2C:39-4a. The jury acquitted

defendant of Counts One and Four, and convicted him of Counts Two

and Three. Accordingly, the jury found defendant guilty of both

murder and aggravated manslaughter for this single homicidal act

against a single victim. After merging Count Three with Count

Two, the judge sentenced defendant to thirty years imprisonment

with thirty years parole ineligibility, the minimum allowable

sentence for murder. See N.J.S.A. 2C:11-3b(1).

 Defendant raises the following points on appeal:

 POINT I

 DUE PROCESS REQUIRES THE KNOWING MURDER AND
 AGGRAVATED MANSLAUGHTER CONVICTIONS TO BE
 REVERSED. THERE WAS ONLY A SINGLE VICTIM, YET
 AN ERRONEOUS JURY INSTRUCTION PERMITTED THE
 JURY TO CONVICT ON BOTH OFFENSES. THE
 REQUISITE MENTAL STATES ARE IRRECONCILABLE AND
 THERE IS NO PRINCIPLED BASIS TO ELEVATE ONE

 2 A-3262-15T4
 CONVICTION OVER THE OTHER. (Not Raised
 Below).

 POINT II

 THE TRIAL COURT ERRED IN ITS FAILURE TO CHARGE
 THE MISTAKE OF FACT DEFENSE. (Not Raised
 Below).

 POINT III

 THE TRIAL COURT ERRED IN ITS FAILURE TO CHARGE
 THE INTOXICATION DEFENSE. (Not Raised Below).

 POINT IV

 THE COURT ERRED IN DENYING DEFENDANT'S MOTIONS
 FOR A JUDGMENT OF ACQUITTAL OF THE MURDER
 CHARGES AND FOR A NEW TRIAL.

 POINT V

 THE AGGRAVATED MANSLAUGHTER CONVICTION SHOULD
 BE REVERSED BECAUSE THE STATE'S IMPROPER
 ARGUMENT ELEVATED DEFENDANT'S STANDARD OF CARE
 ABOVE THE OBJECTIVE REASONABLE PERSON
 STANDARD, WHICH, BY DEFNITION, ESTABLISHES THE
 FLOOR OF RECKLESS CONDUCT. (Not Raised
 Below).

 POINT VI

 THE CUMULATIVE EFFECT OF THE TRIAL ERRORS
 DENIED DEFENDANT HIS RIGHTS TO DUE PROCESS AND
 A FAIR TRIAL, AND WARRANTS REVERSAL. (Not
 Raised Below).

 We agree with Points I and II. We conclude that the failure

to charge the jury to consider the homicide counts sequentially

and failure to charge the defense of mistake of fact constituted

 3 A-3262-15T4
plain error which was not harmless. Accordingly, we reverse and

remand for a new trial as to Counts Two and Three.

 I.

 The homicide occurred on January 5, 2013. Defendant was a

Deptford Township police officer at that time. Defendant and

Compton were close personal friends, a friendship that dated back

to their high school days about ten years earlier. The relevant

factual circumstances can be divided, for purposes of analysis,

into three parts: the events leading up to the time defendant and

Compton were alone in defendant's house, which is where the

homicidal act occurred; the activities and interactions of

defendant and Compton during the hours they were alone in his

house, including the shooting; and the events in the immediate

aftermath of the shooting. All were relevant to the jury's

assessment of defendant's guilt or innocence on the various charges

presented to them.

 The first set of events are not in dispute. Defendant worked

a midnight shift, ending at about 6:30 a.m. on January 4, 2013.

He went home and slept for a few hours, woke up and had lunch, and

remained in his home, where he lived alone. By prior arrangement,

defendant, Compton, and three other men, all of whom were friends

of each other, planned to meet that night at a local bar. At

about 9:00 p.m., Compton arrived at defendant's house. They

 4 A-3262-15T4
watched television together, and, at about 11:00 p.m., Compton

drove himself and defendant to the bar. As planned, they met up

there with their friends. The five friends remained at the bar

until its 2:00 a.m. closing time. They enjoyed their evening,

dancing with some women at the bar, conversing, and, of course,

consuming some alcohol. Defendant contended that he drank about

four beers during the four hours at the bar, and one shot of

liquor.

 At trial, defendant testified that he and Compton had no

disagreements or disputes of any kind during their time together

that evening, including at the bar. The other three men all

testified to the same effect with respect to the bar. A

surveillance video at the bar was played during trial, which

further confirmed there were no disputes between any of the men,

including between defendant and Compton.

 When the bar closed, the other three men went to a nearby

diner. Defendant and Compton went to defendant's house, where it

was their intention to watch a movie, "Dredd," on Compton's

computer through a website. En route from the bar to defendant's

house, the two men stopped at a convenience store for food.

Defendant again testified there was no dispute between the men at

that time, and the surveillance video from the convenience store,

played at trial, confirmed that fact.

 5 A-3262-15T4
 The lead investigator in the case, Detective John Petroski

of the Gloucester County Prosecutor's Office, confirmed in his

trial testimony that the surveillance videos from the bar and the

convenience store did not show any evidence of a conflict between

defendant and Compton. Indeed, defendant, Compton, and several

other friends were scheduled to take a cruise together the

following week.

 The next set of events pertain to the activities at

defendant's house from the time they arrived there until the

shooting that occurred shortly before 5:00 a.m. At trial,

defendant gave a detailed account of his version of what

transpired. Some of what he said was corroborated by physical

evidence later found at the scene; some was not. Of course, the

jury's assessment of defendant's credibility regarding these

critical events was essential to their assessment of his

culpability. It is not disputed that he fired the shot that killed

Compton.

 According to defendant, he and Compton had trouble getting

the movie to play on defendant's television. They finally

succeeded in making the necessary connection to defendant's

computer and began to watch the movie at about 3:30 a.m. Defendant

and Compton sat on opposite ends of the L-shaped couch, with

defendant on the left side and Compton on the right. According

 6 A-3262-15T4
to defendant, during the entire time at his house, after returning

from the bar, he consumed one or two beers and a large glass of

scotch. He said Compton had one beer at his house.

 Defendant carried his off-duty weapon, a Glock .27 handgun,

in an ankle holster. He said that when he sat back to watch the

movie and propped his leg up to relax, the ankle holster became

uncomfortable and he removed it. The gun was loaded with a total

of eleven rounds, nine in the magazine, one in the magazine

extender, and one in the chamber. Defendant said he placed the

holster containing the loaded gun beside himself on the couch.

 According to defendant, Compton inquired about the gun.

Apparently, Compton was unfamiliar with guns and had not had any

personal experience with them. He wanted to know how the gun

worked and wanted to handle it. Defendant said he took all of the

steps required to render the gun safe. After removing it from the

holster, he pointed it to the side, removed the magazine, racked

the slide back to eject the round from the chamber, and visually

and physically ensured there were no rounds in the gun. He then

"dry fired" it a couple of times, pointing it to the side. The

expelled round had fallen on the floor and defendant said he placed

it in a standing up position on the end table next to him. He

said he placed the magazine on the couch near where he was sitting.

He then allowed Compton to handle the gun.

 7 A-3262-15T4
 The movie they were watching was an action film with a lot

of shooting in it. Compton was using the gun to pretend he was

shooting the bad guys in the movie, by dry firing it at the

television. At some point, Compton told defendant he was surprised

at how hard it was to pull the trigger, something he did not

expect. Defendant told him that of the three guns he had, the

Glock .27 had a lighter trigger pull than the other two, an old

revolver and his duty weapon, a Glock .22. Compton asked if he

could see those two guns to compare trigger pulls. Defendant

agreed.

 He left Compton alone in the living room, leaving behind the

ammunition as well as the gun that Compton was handling, and went

upstairs to his bedroom to get the other two guns from the lockbox

in which he kept them. He said he had no bullets for the revolver,

and he had never had any, because he had bought that gun as a

collector's item and never used it for actual firing. Defendant

said that while still upstairs, he rendered the Glock .22 safe in

the same manner as he had done previously with the Glock .27. He

said he left the loaded magazine and the round that was ejected

from the chamber in the lockbox. He then returned to the living

room with both guns.

 Defendant said that when he returned, the Glock .27 appeared

to be in the same area where defendant had previously left it. He

 8 A-3262-15T4
allowed Compton to handle the other two guns and dry fire them.

From time to time, defendant left the living room to use the

bathroom or to get another drink, always leaving the live

ammunition along with the three guns in the living room while

Compton was there alone.

 At some point during the movie, Compton asked defendant how

to reload a gun. Defendant said he explained how it would be done

but did not actually demonstrate it. Defendant drifted off to

sleep. He is not sure how long he slept, but did not believe it

was very long. He said he was awakened by a loud sequence in the

movie, and when he woke up, Compton was laughing at him because

he had fallen asleep.

 Defendant said he reached for the Glock .27 at his side,

observing that the magazine was still outside the weapon and in

the same location where it had previously been on the couch. He

was sitting about six feet from where Compton was sitting on the

other end of the couch. He said he intended to dry fire at the

"bad guys" in the movie, and as he began to pull the trigger,

Compton said something that caused him to instinctively turn toward

Compton. Defendant said as he did so, he was in the process of

completing his trigger pull. He heard a loud boom and "didn't

know what happened." He later surmised that as he was turning

 9 A-3262-15T4
toward Compton the direction of the gun also turned toward him and

the shot struck Compton in the cheek.

 Then, in the immediate aftermath of the shooting, these events

occurred. Upon hearing the loud noise, defendant said he jumped

out of his chair and banged into a nearby table causing his glass

of scotch to break. He dropped the gun and tried to determine

what happened. According to him, he was not aware at that time

that he had fired the gun he was holding and did not know if

somehow one of the other guns had gone off. His first thought was

that if he had fired the gun he was holding "there's going to be

a hole in my TV now if it was that gun." He looked to see if

there was a spark or other damage to his television. He then

realized that Compton should have been "freaking out" like he was,

but he "didn't hear anything from [him]." Defendant then turned

toward Compton and saw a small hole and blood coming from his

cheek.

 Defendant said he immediately attempted to provide first aid

by placing his hand on Compton's cheek to stop the bleeding. He

then ran into the kitchen and got some paper towels. On his way

back to the living room, he grabbed his cell phone. He said while

keeping one hand on Compton's cheek with the paper towels, and

holding the phone with the other hand, he called a direct line to

County Dispatch that was programmed into his phone.

 10 A-3262-15T4
 Defendant said he chose to call that number rather than 911

because, in his estimation, it was the quickest way to get

emergency assistance. He said he was aware that 911 calls are

sometimes misdirected. Even more specifically, he said that his

home is in Deptford Township, but has a Wenonah address, and is

also very close to another neighboring community, Woodbury

Heights.

 The recording of the call was played twice for the jury, once

during the State's case and once during defendant's. The recording

revealed that defendant immediately identified himself as a police

officer by badge number and that he requested an ambulance for a

man who was shot. When asked what happened, defendant said: "we

had a, a, a man, he was ah playing with a weapon, it was loaded

and ah he, there was a shot fired." He said the man was shot in

the cheek, and he said he was putting pressure on his cheek at

that time. The dispatcher asked whether this was a family member,

and defendant responded that it was "a friend."

 Another dispatcher then got on the line and asked defendant

how it happened, to which defendant replied: "Ah he was, he was

playing with one of my weapons, I, I don't know how it happened,

I don't know." This dispatcher then instructed defendant to go

and get a clean towel and hold it with pressure on the wound.

Defendant apparently went and got a towel and told the dispatcher

 11 A-3262-15T4
he had done so and was holding it on Compton's wound. The

dispatcher then told defendant an ambulance was on its way. The

call ended at that point.

 The dispatcher then called Sergeant Edward Kiermeier of the

Deptford Township Police Department to confirm that the call was

not a prank. The first dispatcher, Patricia Warlow, "wanted to

make sure that before [she] put it out over the radio that the

guys weren't messing and saying, he said that his friend shot

himself in the cheek." Kiermeier said he and other officers would

immediately go to defendant's home and asked Warlow to hold off

on broadcasting the call.

 At trial, Warlow testified that she was unsure whether the

caller was sincere because the tone of his voice was "too quiet

and [a] whisper. There was no urgency in the call like I previously

had with other gunshot calls." However, Warlow acknowledged that

it is often difficult to hear clearly the voice coming in, and

indicated this might have been the situation when defendant said

he was putting pressure on Compton's cheek. She also acknowledged

that the other dispatcher on the call, Elliott Davis, did not

think it sounded like the caller was kidding. Indeed, in the

recording of the call with Kiermeier, Davis said: "It doesn't

sound like he's joking around at all." Davis did not testify at

trial.

 12 A-3262-15T4
 The recording of these calls confirmed that the movie was

still playing and could be heard in the background. Defendant

said that at one point during his conversation with the

dispatchers, he put the phone on speaker to enable him to better

tend to Compton.

 Defendant further testified that, after the emergency call

ended, he took it upon himself to do something other than continue

tending to Compton while waiting for emergency personnel to arrive.

He said he was aware from his police experience that emergency

personnel would not enter a residence if it contained unsecured

firearms. Instead, they would wait outside for police officers

to arrive to clear the scene. For this reason, he said he felt

there was not much he could do for Compton at that time, so he

racked the slide back on the Glock .27, placed its magazine in the

gun and ran to his bedroom with that gun in his bloody right hand

and the other two guns in his clean left hand. His reason for

placing the magazine in the Glock .27 was to make it easier to

carry all three guns at once. He placed the Glock .27 on top of

his bedroom dresser, and placed the Glock .22 and revolver in the

lockbox, which he then closed. He said he wiped the blood from

his hand on his jeans and then ran back downstairs to Compton. He

said it appeared that Compton was choking on his own blood and he

 13 A-3262-15T4
began to reposition him on his side. At that time, the police

arrived.

 Kiermeier said he was notified at about 5:01 a.m. that County

Dispatch had received a potential prank call and he personally

went to the location. He arrived at defendant's home at 5:07 a.m.

Two other officers arrived at the same time in separate vehicles.

Defendant opened the door for Kiermeier, who saw Compton lying

upright on the couch. He was unconscious and unresponsive, but

was breathing and had a pulse. There was a cloth towel and paper

towels beside him. Kiermeier asked defendant where the weapons

were and what happened. Defendant replied that the weapons were

in a safe upstairs.

 On Kiermeier's instructions, one of the other officers

removed defendant from the home and stayed with him in the

backyard. Kiermeier said defendant appeared to be in a state of

shock, looking like he was "in a complete daze." He said he "kept

on asking [defendant], 'What happened? Did he shoot himself? Did

you shoot him?'" Kiermeier continued that he believed defendant

said "I don't know." On cross-examination, Kiermeier acknowledged

that defendant had not simply stated that he had no idea what

happened, but said "[h]is friend was shot by accident."

 14 A-3262-15T4
 Paramedics arrived at 5:09 a.m. They removed Compton from

the scene at 5:35 a.m. and transported him by ambulance to a

hospital, where he died six days later from the gunshot wound.

 There was considerable testimony from various witnesses

regarding the conditions at defendant's house after the shooting.

The living room was messy. Different witnesses described it

differently. It was acknowledged that some of the mess may have

occurred through the activities of the paramedics. Defendant

testified that he is not a particularly good housekeeper.

Kiermeier said it was "kind of messy," and looked to him like a

"frat house." The significance of this testimony is that it could

have supported an inference that defendant and Compton had engaged

in a physical altercation of some sort.

 Further, the prosecutor argued that some of defendant's

testimony was incredible. For example, his decision to remove the

guns from the living room not only was contrary to police training

not to disturb the scene of a potential crime, but could not have

really been accomplished in the manner defendant described. The

guns in the lockbox, namely his duty weapon and the revolver, were

in the same location as they would normally be. The Glock .22 was

fully loaded, yet there was no blood in the closet, no blood on

the safe, no blood on the duty weapon or its magazine, or on the

 15 A-3262-15T4
revolver. The prosecutor argued that this scenario defied

credulity:

 Now remember: When he took it out of the
 safe, he says initially there was one in the
 chamber and the magazine was separate. So he
 ejected the live round and left it in the safe,
 the lock box. That's his testimony. He would
 have had to go back up, one-handed, with two
 guns in his hand, put the guns -- open the
 safe, or he said he left the safe open. Put
 the guns in. He would have -- to get the gun
 the way that it was found, he would have had
 to reload it, rack it, and drop the magazine
 out again to put one in the chamber. Because
 when we found that gun in the safe, there was
 one in the chamber. He did all that with one
 hand and never got any blood on anything?

 This argument calls into question defendant's entire story

about bringing the extra guns downstairs because Compton wanted

to see them and compare the trigger pulls and about the dry firing

at the bad guys in the movie, leading up to the live shot that

killed Compton.

 As to that shot, the prosecutor suggested it was unlikely

that Compton would have attempted to load the gun on his own, and

the defense suggestion that Compton did so while defendant had

dozed off was also not believable. The prosecutor demonstrated

to the jury the difficulty and noise that would be attendant to

placing one round in the chamber of the Glock .27. She said:

 He would have had to put the magazine in.
 Rack the slide back, and then eject the
 magazine and put it down and put this in the

 16 A-3262-15T4
 exact same location where it was without the
 defendant waking up or knowing what he was
 doing.

 Now, he said that there was a movie
 playing in the background. And yes, you can
 hear it on parts of the dispatch tape. It's
 not very loud, though. So he didn't hear the
 slide being racked. He didn't hear the
 magazine clicking, nothing.

 And David would have had to, again, load
 it, rack it, drop the magazine out -- that
 would've kept one in the chamber, and then the
 magazine come out -- put it right back where
 it was.

 The State also emphasized at trial, and continues to argue,

that defendant's initial call to County Dispatch is significant

in that he was concealing any level of culpability. He chose his

words very carefully to make it sound as though the victim had

accidentally shot himself. The State also points out that the

evidence revealed a slightly downward trajectory to the bullet

wound, which is inconsistent with defendant's testimony that he

was sitting on the couch at the same level as Compton, when the

shot was fired. This evidence could suggest that defendant was

standing when he fired the shot.

 Without dispute, defendant had been consuming alcohol in the

hours prior to the shooting. A blood draw of defendant at 8:42

a.m., about four hours after the shooting, revealed a blood alcohol

content of .144 percent. The State did not produce expert

 17 A-3262-15T4
testimony in an effort to extrapolate from this result what

defendant's blood alcohol content would have been at the time of

the shooting. Instead, the State simply pointed out that

defendant's blood alcohol level was far above the .08 percent

level at which driving a motor vehicle is prohibited.

 Ballistics testimony established that the shot was fired from

at least five and one-half feet away from Compton. This is

consistent with defendant's testimony that he was sitting about

six feet away from Compton when the shot was fired.

 The Glock .27, covered in blood, was found on defendant's

dresser in his upstairs bedroom. It contained a magazine loaded

with nine bullets and none in the chamber. It was "locked to the

rear." Because the Glock .27 could hold a total of eleven rounds,

the other two had to be accounted for. One was accounted for by

an empty shell casing found in the living room, and the other was

a live round found on or near the table where defendant said he

had placed it when he first rendered the gun safe. The evidence

established that if the gun would have been fired with the magazine

in it, another live round would have automatically been fed into

the chamber. When the gun was recovered from defendant's dresser,

there was not a bullet in the chamber. Thus, at least to some

extent, these circumstances were consistent with defendant's

version of the events.

 18 A-3262-15T4
 Throughout his testimony, both on direct and cross-

examination, defendant repeatedly insisted that he was 100% sure

the Glock .27 was safe. He did not believe his friend would ever

have attempted to load the gun after defendant had initially made

it safe. However, in hindsight, he surmised that Compton must

have loaded it while defendant was sleeping. This was his entire

defense to any homicide charges, whether murder, aggravated

manslaughter, or reckless manslaughter. Defendant steadfastly

insisted that he would have never pulled the trigger of the Glock

.27 if he had any reason to believe or suspect that it was loaded.

 In her summation, the prosecutor made strong arguments as to

how the evidence constituted proof of defendant's recklessness.

She mentioned the murder charges only briefly and did not dwell

upon how the evidence supported proof of either purposeful or

knowing murder. She referred to the allowable permissive inference

that a jury could draw from the use of a deadly weapon in killing

another that it was the perpetrator's purpose to take the victim's

life or cause serious bodily injury resulting in death. Indeed,

the prosecutor concluded her summation by urging the jury "to

please find him guilty of at least aggravated manslaughter."

 When faced with motions for acquittal of murder, both at the

end of the State's case and at the conclusion of all the evidence,

the trial court noted that this was an extremely close case, closer

 19 A-3262-15T4
than any he had ever seen or heard of before. However, he concluded

that there was sufficient evidence upon which a jury could

reasonably convict defendant of murder, and he denied the motions.

 II.

 Defendant contends in Point I that his murder and aggravated

manslaughter convictions are fatally irreconcilable and resulted

from erroneous jury instructions on the homicide charges. More

particularly, defendant argues that the trial court erred by

permitting the jury to render verdicts on incompatible theories

of culpability for commission of a homicide and that the jury did,

in fact, find that defendant acted with two mutually exclusive

states of mind in killing Compton. Defendant argues that, in the

circumstances of this case, there is no sound basis to favor one

conviction over the other and due process requires that both

convictions be vacated.

 At the charge conference, the court reviewed with counsel its

proposed jury instructions. The charge instructed the jurors to

render its verdict on Count One, purposeful murder. Then, whether

guilty or not, the jury was instructed to render its verdict on

Count Two, knowing murder. Then, again whether guilty or not, to

render its verdict on Count Three, aggravated manslaughter.

Finally, with respect to the homicide charges, the jurors would

be instructed that if they found defendant guilty of aggravated

 20 A-3262-15T4
manslaughter, they should skip the next question, pertaining to

reckless manslaughter, and go on to their consideration of Count

Four. If, however, they found defendant not guilty of aggravated

manslaughter, they would be instructed to consider and decide

whether defendant should be found guilty or not guilty of the

lesser-included offense of reckless manslaughter. The proposed

jury verdict sheet was set up accordingly. Neither counsel

objected to these provisions in the jury instructions or on the

verdict sheet. The instructions were thus given, and, as we have

stated, the jury found defendant not guilty of purposeful murder,

but guilty of both knowing murder and reckless manslaughter.

 Defendant now argues, for the first time on appeal, that

these instructions were erroneous as they failed to direct the

jury to render its verdict in sequence, first on the murder

charges1, to consider aggravated manslaughter only if defendant

were found not guilty of murder, and likewise, to consider reckless

manslaughter only if they found defendant not guilty of aggravated

1
 The prevailing practice is to combine knowing or purposeful
murder in a single count of an indictment. After being instructed
on both forms of murder, jurors are then further instructed that
they do not have to agree unanimously as to which form of murder
is present, as long as they all believe it was one form of murder
or the other. Model Jury Charge (Criminal), "Murder and
Aggravated/Reckless Manslaughter" (2011).

 21 A-3262-15T4
manslaughter. Defendant argues this is plain error which deprived

him of a fair trial.

 In Point II, defendant argues that the trial court also

committed plain error in failing to charge the mistake of fact

defense. At the charge conference, this potential instruction was

never discussed. Defense counsel never requested it, and the

court did not give it. Defendant's entire defense was predicated

upon his unyielding assertion that he was certain, in his own

mind, that the Glock .27 was unloaded, and that otherwise, he

would not have been dry firing it at the television and would not

have tragically pivoted towards Compton in response to Compton's

voice. Defendant argues that "[r]eversal of the murder and

aggravated manslaughter convictions should be ordered because this

failure deprived defendant of a fair trial," citing U.S. Const.

amends. V and XIV, and N.J. Const. art. I, ¶ 10.

 Defendant asserts that either of these plain errors in the

jury instructions constitute, individually, a basis for reversal.

Obviously, defendant also argues that the cumulative effect of

both errors adds greater weight to the need for reversal. We

agree with defendant.

 Jury instructions not objected to at trial are reviewed for

plain error. State v. McKinney, 223 N.J. 475, 494 (2015). We

will only reverse if that error was "clearly capable of producing

 22 A-3262-15T4
an unjust result." R. 2:10-2; State v. Adams, 194 N.J. 186, 207

(2008). Our Supreme Court has established that

 [i]n the context of jury instructions, plain
 error is "[l]egal impropriety in the charge
 prejudicially affecting the substantial
 rights of the defendant and sufficiently
 grievous to justify notice by the reviewing
 court and to convince the court that of itself
 the error possessed a clear capacity to bring
 about an unjust result."

 [State v. Camacho, 218 N.J. 533, 554 (2014)
 (second alteration in original) (quoting State
 v. Adams, 194 N.J. 186, 207 (2008)).]

An unjust result arises when the error raises a reasonable doubt

as to whether the jury was led to a result it might not otherwise

have reached. State v. Taffaro, 195 N.J. 442, 454 (2008).

 The court must not look at portions of the charge alleged to

be erroneous in isolation; rather, "the charge should be examined

as a whole to determine its overall effect," State v. Jordan, 147

N.J. 409, 422 (1997) (quoting State v. Wilbely, 63 N.J. 420, 422

(1973)), and "whether the challenged language was misleading or

ambiguous," State v. Nelson, 173 N.J. 417, 447 (2002) (citing

State v. Simon, 161 N.J. 416, 477 (1999)).

 "An essential ingredient of a fair trial is that a jury

receive adequate and understandable instructions." State v.

Afanador, 151 N.J. 41, 54 (1997). Jury instructions have been

described as "a road map to guide the jury, and without an

 23 A-3262-15T4
appropriate charge a jury can take a wrong turn in its

deliberations." State v. Martin, 119 N.J. 2, 15 (1990). The

judge "should explain to the jury in an understandable fashion its

function in relation to the legal issues involved." State v.

Green, 86 N.J. 281, 287 (1981). The trial judge must deliver "a

comprehensible explanation of the questions that the jury must

determine, including the law of the case applicable to the facts

that the jury may find." Id. at 287-88. The trial judge must

"instruct the jury as to the fundamental principles of law which

control the case . . . [including] the definition of [the] crime,

the commission of which is basic to the prosecution against the

defendant." Id. at 288 (quoting State v. Butler, 27 N.J. 560, 595

(1958)).

 "Because proper jury instructions are essential to a fair

trial, 'erroneous instructions on material points are presumed to'

possess the capacity to unfairly prejudice the defendant." State

v. Bunch, 180 N.J. 534, 541-42 (2004) (quoting Nelson, supra, 173

N.J. at 446). See also Jordan, supra, 147 N.J. at 422 (holding

that some jury instructions are "so crucial to the jury's

deliberations on the guilt of a criminal defendant that errors in

those instructions are presumed to be reversible."). Therefore,

"[e]rroneous instructions are poor candidates for rehabilitation

 24 A-3262-15T4
as harmless, and are ordinarily presumed to be reversible

error." Afanador, supra, 151 N.J. at 54.

 "This requirement of a charge on a fundamental matter is more

critical in a criminal case when a person's liberty is at stake."

Green, supra, 86 N.J. at 289. "The key to finding harmless error

in such cases is the isolated nature of the transgression and the

fact that a correct definition of the law on the same charge is

found elsewhere in the court's instructions." State v. Sette, 259

N.J. Super. 156, 190-91 (App. Div.), certif. denied, 130 N.J. 597

(1992).

 Because defendant was acquitted of purposeful murder, he

cannot be retried for that offense under double jeopardy

principles. We therefore limit our discussion to knowing murder.

To prove a defendant guilty of knowing murder, the State must

prove beyond a reasonable doubt that the defendant caused the

victim's death or serious bodily injury that resulted in the

victim's death, and did so knowingly. N.J.S.A. 2C:11-3a(2). "A

person acts knowingly with respect to a result of his conduct if

he is aware that it is practically certain that his conduct will

cause such a result." N.J.S.A. 2C:2-2b(2). Thus, the State was

required to prove that defendant was aware that his conduct

(pulling the trigger while the gun was pointed at Compton) would

kill Compton or cause serious bodily injury resulting in death.

 25 A-3262-15T4
 On the other hand, as relevant here, a defendant commits

aggravated manslaughter if he "recklessly causes death under

circumstances manifesting extreme indifference to human life."

N.J.S.A. 2C:11-4a(1). "A person acts recklessly with respect to

a material element of an offense when he consciously disregards a

substantial and unjustifiable risk that the material element

exists or will result from his conduct." N.J.S.A. 2C:2-2b(3).

Thus, for defendant to be convicted of aggravated manslaughter,

the State was required to prove beyond a reasonable doubt that he

acted recklessly, namely that he consciously disregarded a

substantial and unjustifiable risk that his conduct would cause

Compton's death or serious bodily injury resulting in death.

 Thus, knowing murder requires not only awareness, but a

practical certainty that defendant's conduct would cause death or

serious bodily injury resulting in death, whereas manslaughter

involves only a conscious disregard of a substantial and

unjustifiable risk of death. State v. Breakiron, 108 N.J. 591,

605 (1987). See also State v. Wilder, 193 N.J. 398, 409 (quoting

State v. Jenkins, 178 N.J. 347, 363 (2004)).

 The model jury instruction on murder and manslaughter directs

the jury to consider manslaughter only if it acquits of murder:

 If you determine that the State has
 proven beyond a reasonable doubt that the
 defendant purposely or knowingly caused death

 26 A-3262-15T4
 . . . , you must find the defendant guilty of
 murder.

 If, on the other hand, you determine that
 the State has not proven beyond a reasonable
 doubt that the defendant purposely or
 knowingly caused death or serious bodily
 injury resulting in death, then you must find
 him/her not guilty of murder (and go on to
 consider whether the defendant should be
 convicted of the crimes of aggravated or
 reckless manslaughter).

 [Model Jury Charge (Criminal) "Murder And
 Aggravated/Reckless Manslaughter" (2011)
 (emphasis added).]

 The State argues that because aggravated manslaughter is a

lesser-included offense of murder only because "a lesser kind of

culpability suffices to establish its commission," N.J.S.A. 2C:1-

8d(3), it is not inconsistent for a defendant to be convicted of

both offenses. This argument has facial appeal because imbedded

within the definition of recklessness is a concept similar to

"knowing" conduct, namely, conduct by which an actor "consciously"

disregards a particular risk. However, this argument does not

take into account the requirement that a lesser-included offense

should not be submitted to a jury for consideration unless they

have first unanimously found the defendant not guilty of the

greater offense. State v. Zola, 112 N.J. 384, 405 (1988) cert.

denied, 489 U.S. 1022, 109 S. Ct. 1146, 103 L. Ed. 2d 205 (1989).

This accords with the principle that "a trial court has an

 27 A-3262-15T4
independent obligation to instruct on lesser-included charges when

the facts adduced at trial clearly indicate that a jury could

convict on the lesser while acquitting on the greater offense."

Jenkins, supra, 178 N.J. at 361 (emphasis added). In State v.

Ruiz, 399 N.J. Super. 86, 96 (App Div. 2008), we described the

principle as follows:

 A lesser-included offense charge is warranted
 when (1) "the requested charge satisf[ies] the
 definition of an included offense set forth
 in N.J.S.A. 2C:1-8d, and (2) . . . there [is]
 a rational basis in the evidence to support a
 charge on that included offense." State v.
 Thomas, 187 N.J. 119, 131 (2006); see also
 N.J.S.A. 2C:1-8e (included offense should not
 be charged "unless there is a rational basis
 for a verdict convicting the defendant of the
 included offense"). "[A] rational basis in
 the evidence for a jury to acquit the
 defendant of the charged offense [is also
 necessary] before the court may instruct the
 jury on an uncharged offense." State v.
 Brent, 137 N.J. 107, 113-14 (1994).

 [(emphasis and alterations in original).]

 We further noted in Ruiz that there is "no meaningful

difference between a crime charged in an indictment and an

unindicted lesser-included offense based on the trial evidence."

Id. at 99. Therefore, the fact that aggravated manslaughter was

included in the indictment as a separate count does not distinguish

it from the principles generally applicable to submitting lesser-

 28 A-3262-15T4
included offenses to a jury. One such principle is that the jury

must first acquit of the greater offense.

 This is what our Model Jury Charge prescribes, as well as the

model verdict sheet. This practice channels the jury's attention

to the distinction between the various homicide offenses that it

may choose from, with a clear mandate that the jury may either

find the defendant not guilty or choose one and only one of the

homicide charges that is appropriate based on the evidence. And,

because there is no meaningful distinction between an indicted

lesser-included offense and one simply based on the evidence (as

was, in this case, reckless manslaughter), the State is not

deprived of having the jury consider all appropriate offenses.

The State's charging discretion is not impaired.

 It is clear to us that the guilty verdicts on murder and

aggravated manslaughter were inconsistent. We are mindful of the

Dunn/Powell2 rule, which provides generally that inconsistent

verdicts are permitted to stand "because it is beyond our power

to prevent them." State v. Banko, 182 N.J. 44, 54 (2004). Such

verdicts are permitted, even when the jury's action does not

benefit the defendant, "so long as the evidence was sufficient to

2
 Dunn v. United States, 284 U.S. 390, 52 S. Ct. 189, 76 L.
Ed. 356 (1932); United States v. Powell, 469 U.S. 57, 105 S.
Ct. 471, 83 L. Ed. 2d 461 (1984).

 29 A-3262-15T4
establish guilt on the substantive offense beyond a reasonable

doubt." Id. at 55 (quoting State v. Petties, 139 N.J. 310, 319

(1995)). "That said, the return of an 'inconsistent verdict' may

not insulate a conviction from reversal based on other defects in

the criminal proceeding." Ibid. In other words, the "Dunn/Powell

rule does not sanitize other trial errors," State v. Grey, 147

N.J. 4, 17 (1996), such as "when an incomplete or misleading jury

instruction causes an unfair trial." Banko, supra, 182 N.J. at

55.

 The instruction here was misleading and led to an implausible

result. A defendant cannot act simultaneously with distinctly

different mental states. The jury should have been instructed to

choose which, if any, of the mental states was proven beyond a

reasonable doubt, and in a descending order of culpability to

comply with the principle that a lesser-included offense will be

considered only if the greater offense has first been unanimously

found not to have been proven beyond a reasonable doubt. We

conclude that the inconsistency is not "sanitized" and cannot be

overlooked or adjusted by merger at sentencing, as was done here.

On the contrary, we conclude that the misleading instruction caused

an unfair trial.

 We next consider the failure to instruct the jury regarding

mistake of fact. This case cried out for such an instruction.

 30 A-3262-15T4
Indeed, in its appellate brief, the State begins its discussion

on that point as follows: "The State recognizes the strength of

the Defendant's argument with regard to a charge to a mistake of

fact in the jury instructions." Then, after acknowledging that

no such instruction was given, the State continues: "However, the

jury was instructed they could consider Defendant's testimony in

terms of credibility." The State continues to argue that the

mistake of fact instruction was not necessary because the jurors

were instructed to consider the evidence presented by the witnesses

and their credibility, and because defendant did not raise an

objection at trial.

 We do not agree that the instructions as a whole were adequate

to instruct the jurors on this critical point of law as it applied

to the facts of this case. As to the absence of an objection, of

course we are guided by the plain error standard. As with the

error regarding the homicide charges, the error in failing to give

a mistake of fact charge raises a reasonable doubt as to whether

the jury was led to a result it might not otherwise have reached.

Taffaro, supra, 195 N.J. at 454.

 N.J.S.A. 2C:2-4a(1) provides that a mistake of fact "is a

defense if the defendant reasonably arrived at the conclusion

underlying the mistake and . . . [the mistake] negatives the

culpable mental state required to establish the offense."

 31 A-3262-15T4
 "[E]vidence of [a defendant's] mistaken belief relates to

whether the State has failed to prove an essential element of the

charged offense beyond a reasonable doubt." State v. Sexton, 160

N.J. 93, 106 (1999). "'No person may be convicted of an offense

unless each element of such offense is proven beyond a reasonable

doubt.' If the defendant's ignorance or mistake makes proof of a

required culpability element impossible, the prosecution will

necessarily fail in its proof of the offense." Sexton, supra, 160

N.J. at 100 (quoting Paul H. Robinson & Jane A. Grall, Element

Analysis in Defining Criminal Liability: The Model Penal Code and

Beyond, 35 Stan. L. Rev. 681, 726-27 (1983) (quoting Model Penal

Code § 1.12(1) (Proposed Official Draft 1962)). In other words,

mistake of fact is not a separate element but a "defense" against

the mental state element, which, once raised, the State must

overcome.3 Id. at 106-07.

 In Sexton, the jury found the defendant guilty of reckless

manslaughter. 160 N.J. at 96. The Supreme Court held the trial

court erred in not charging the jury with mistake of the fact,

even if unreasonable, that Sexton thought the gun was unloaded

3
 Subsection (a) of the mistake of fact statute is "technically
unnecessary" given the prosecution's obligation to prove each
element of an offense beyond a reasonable doubt. See State v.
Pena, 178 N.J. 297, 306 (2004) (citing Sexton, supra, 178 N.J. at
106).

 32 A-3262-15T4
when he shot his victim. Id. at 105-07. There, the victim gave

Sexton a gun with the assurance it was not loaded. Id. at 95.

Unbeknownst to either party, there was a bullet in the firing

chamber which killed the victim when Sexton pulled the trigger.

Ibid. A ballistics expert testified that a gun novice might have

thought the gun was unloaded if the magazine was removed after one

round was inserted in the chamber. Ibid. The Court suggested

that, instead of charging mistake as a separate defense for a

crime based on recklessness, the jury should be charged as to the

elements of the offense and how the claimed mistake affects the

culpability the State must prove. Id. at 106.

 The Sexton Court suggested the following mistake of fact

charge for reckless manslaughter:

 In this case, ladies and gentlemen of the
 jury, the defendant contends that he
 mistakenly believed that the gun was not
 loaded. If you find that the State has not
 proven beyond a reasonable doubt that the
 defendant was reckless in forming his belief
 that the gun was not loaded, defendant should
 be acquitted of the offense of manslaughter.
 On the other hand, if you find that the State
 has proven beyond a reasonable doubt that the
 defendant was reckless in forming the belief
 that the gun was not loaded, and consciously
 disregarded a substantial and unjustifiable
 risk that a killing would result from his
 conduct, then you should convict him of
 manslaughter.

 [Ibid.]

 33 A-3262-15T4
After setting forth this suggested charge, the Court stated:

"Undoubtedly, our Committee on Model Criminal Charges can improve

the formulation." Ibid.

 The formulation presently in effect for the mistake of fact

charge, for a knowing or purposeful crime, approved in 2007, is

as follows:

 If you find that the State has failed to
 prove beyond a reasonable doubt that defendant
 did not believe that (mistake of fact or law),
 then you must find him/her not guilty of
 (offense charged). However, if you find that
 the State has proven beyond a reasonable doubt
 that defendant did not believe (mistake of
 fact or law), and you find that the State has
 proven all of the elements of the offense
 beyond a reasonable doubt, then you must find
 him/her guilty of (offense charged).

 [Model Jury Charge (Criminal) "Ignorance or
 Mistake" (2007).]

For a reckless crime, the model charge provides:

 If you find that the State has failed to
 prove beyond a reasonable doubt that defendant
 did not believe that (mistake of fact or law),
 or that he/she was reckless in forming that
 belief, as I have already defined that term
 for you, then you must find him/her not guilty
 of (offense charged). However, if you find
 that the State has proven beyond a reasonable
 doubt that defendant did not believe that
 (mistake of fact or law), or that he/she acted
 recklessly in forming that belief, and you
 find that the State has proven all of the
 elements of the offense beyond a reasonable
 doubt, then you must find defendant guilty of
 (offense charged).

 34 A-3262-15T4
 [Ibid.]

 Thus, to find defendant guilty of knowing murder, the State

was obligated to prove beyond a reasonable doubt that defendant

did not believe that the gun was unloaded. If the jury was

convinced that the State carried its burden on this point, the

jury would then go on to consider whether the State proved all

elements of knowing murder beyond a reasonable doubt, in which

case they must find defendant guilty of that charge.

 To find defendant guilty of a reckless crime, including

aggravated manslaughter, and, if the jury were to reach it,

reckless manslaughter, the State was obligated to prove beyond a

reasonable doubt either that defendant did not believe that the

gun was unloaded or that he was reckless in forming that belief.

If the jury was convinced that the State carried its burden on

this point, the jury would then go on to determine whether the

State proved all of the elements of the offense beyond a reasonable

doubt, in which case it must find defendant guilty of that offense.

 A review of the totality of the judge's charge convinces us

that these important principles were not conveyed to the jury. In

his summation, defense counsel touched upon the subject to some

extent, arguing that defendant could not be guilty of knowing

murder because he "believed in his mind that the gun wasn't

loaded." With respect to aggravated manslaughter, defense counsel

 35 A-3262-15T4
argued that defendant could not be guilty because he "picked up

the gun . . . to dry-fire it at the TV, . . . pulling back on the

trigger" while turning toward Compton "and bang! The shot goes

off." In her summation, the prosecutor did not broach the subject.

 In our view, even though we are well aware that defendant's

asserted mistake of fact was highlighted in the trial, particularly

through defendant's testimony, defense counsel's limited reference

to it in his summation was not sufficient to convey to the jury

the significance of this point. Further, defense counsel's

argument was posited in his capacity as an advocate for defendant.

The judge correctly charged the jury that arguments of counsel are

not evidence. In her summation the prosecutor did not acknowledge

that she was required, in order to obtain a conviction, to prove

beyond a reasonable doubt that defendant did not believe that the

gun was unloaded (as to murder) or, as to manslaughter, that she

was required to prove beyond a reasonable doubt that defendant did

not believe the gun was unloaded, or if he did, he recklessly

formed that belief. Even had the prosecutor conceded that point,

the absence of a clear and unequivocal explanation by the court,

in accordance with the model charge, might have still required

reversal.

 The plain error occasioned by these two shortcomings in the

jury instructions cannot be viewed as an isolated transgression

 36 A-3262-15T4
that we can overlook because the correct principles of law were

provided to the jury elsewhere in the court's instructions, or at

least in the arguments of counsel. Thus, we cannot deem these

errors harmless. A new trial is required on the remaining charges

for which defendant was not acquitted.

 III.

 For the sake of completeness, we briefly address defendant's

remaining arguments. In Point III, defendant argues that the

court erred in failing to charge the jury with the voluntary

intoxication defense. Voluntary intoxication can provide

a defense to a charge of knowing and purposeful conduct if it is

sufficient to cause a "prostration of faculties," meaning the

intoxication must be of an "extremely high level" rendering the

defendant incapable of forming an intent to commit the crime.

State v. Cameron, 104 N.J. 42, 54 (1986); see also N.J.S.A. 2C:2-

8a and b. A jury issue arises only if the evidence is such that

a jury could conclude that defendant's faculties were so

prostrated. State v. R.T., 205 N.J. 493, 508 (2011). If not, the

charge is not warranted. Ibid.

 If a defendant requests the charge, it will be given if there

is a rational basis in the evidence for it. Id. at 509 (2011).

If defense counsel does not request the instruction, the "clearly

 37 A-3262-15T4
indicated" standard applies, in which the need for the charge must

"jump off" the page. Id. at 509-10.

 In this case, defendant testified and gave an extremely

detailed account, often minute by minute, of the events that

transpired in his home when he was there alone with Compton after

returning from the bar and leading up to the shooting. His

detailed account included the shooting itself and his actions in

the immediate aftermath of the shooting. In describing the events

and the actions he took, he often gave detailed accounts of his

thought processes in real time which induced him to act in that

manner. Simply stated, it was not clearly indicated from this

record that defendant met the prostration of faculties test. There

was no error in failing to give this charge.

 In Point IV, defendant argues that the court erred in denying

his motions for acquittal at the end of the State's case and again

at the conclusion of all evidence. We have described previously

in this opinion some of the facts that weigh against reckless

conduct and could have supported a jury finding of knowing conduct

in defendant's shooting of Compton. Defendant's vague and

misleading statements to the dispatcher when he called for

assistance could be deemed indicative of denying any culpability.

The fact that he called County Dispatch as a police officer, rather

than the public 911 service, could be viewed as evidence that he

 38 A-3262-15T4
was hoping for preferential treatment. The downward projection

of the wound could support a finding that he was standing, not

sitting as he said he was, when he shot Compton. The jury could

have rejected as incredible defendant's testimony that Compton

asked him how to reload the gun, that he explained the process,

and shortly thereafter fell asleep, during which time Compton must

have reloaded the gun by placing one live round in the chamber,

but without the magazine being left in the gun. Likewise, the

jury could have rejected defendant's description of replacing his

duty weapon and revolver in the lock box, having reloaded the duty

weapon to its normal condition, but with a total absence of blood

on the guns, the magazine, the lock box, or in the closet.

 Overall, in assessing a trial court's ruling on a motion for

judgment of acquittal, an appellate court reviews the decision de

novo. State v. Williams, 218 N.J. 576, 593-94 (2014). In so

doing, this court must determine "whether the evidence, viewed in

its entirety, be it direct or circumstantial, and giving the State

the benefit of all of its favorable testimony as well as all of

the favorable inferences which reasonably could be drawn," is

sufficient to allow the jury to find guilt beyond a reasonable

doubt. State v. Kluber, 130 N.J. Super. 336, 341 (App.

Div.), certif. denied, 67 N.J. 72 (1975) (citing State v. Reyes,

50 N.J. 454, 458-59 (1967)); see also R. 3:18-1 (discussing a

 39 A-3262-15T4
motion for acquittal at the close of the State's case). If the

State has failed to prove any one of the elements of the crime

charged, the motion must be granted. Pressler & Verniero, Current

N.J. Court Rules, comment 1 on R. 3:18-1 (2016). The "trial judge

is not concerned with the worth, nature or extent (beyond a

scintilla) of the evidence, but only with its existence, viewed

most favorably to the State." Kubler, supra, 130 N.J. Super. at

342.

 A trial court's ruling on a motion for a new trial "shall not

be reversed unless it clearly appears that there was a miscarriage

of justice under the law." R. 2:10-1.4 See also Dolson v.

Anastasia, 55 N.J. 2, 7 (1969).

 From our review of the record, we concur with the trial

court's assessment that this was a very close case as between

murder and aggravated or reckless manslaughter. However, it does

not clearly appear to us that there was a miscarriage of justice

4
 Similarly, pursuant to Rule 3:20-1, the trial judge shall not
set aside a jury verdict unless "it clearly and convincingly
appears that there was a manifest denial of justice under the
law." The "semantic" difference between "miscarriage of justice"
and "manifest denial of justice under the law" is an "oversight
and should not be construed as providing for a different standard
in criminal cases at the trial level than that applicable to
appellate review and to civil cases at the trial level." Pressler
& Verniero, Current N.J. Court Rules, comment 2 on R. 3:20-
1 (2016) (citing State v. Perez, 177 N.J. 540, 555 (2003); State
v. Gaikwad, 349 N.J. Super. 62, 82 (App. Div. 2002)).

 40 A-3262-15T4
under the law. Defendant's argument on this point does not provide

a basis for reversal.

 In Point V, defendant argues, for the first time on appeal,

that the aggravated manslaughter conviction should be reversed

because the State improperly argued that defendant should be

subject to an elevated standard of care by virtue of his police

officer status. Through cross-examination, the prosecutor

established that defendant received special training in the

handling of firearms, firearms safety, the use of firearms, and

the like. The prosecutor elicited that by defendant's version of

the events, his conduct constituted violations of some

departmental regulations pertaining to firearms. In her

summation, the prosecutor recounted some of this testimony and

argued that the jury should consider defendant's specialized

firearms training in assessing whether he acted in a reckless

manner.

 The court instructed the jury on recklessness, including the

provision that the risk disregarded by a defendant charged with

reckless conduct must be a gross deviation from "the standard of

conduct that a reasonable person would follow in the same

situation." Defendant now argues that it was improper to suggest

that a police officer, trained in firearm safety, should be held

to a higher standard.

 41 A-3262-15T4
 Defense counsel did not object to any of the questions posed

in this regard, nor to the prosecutor's summation comments on this

point. In light of the absence of timely objections, the court

was not given the opportunity to rule on the objections, and, if

deemed appropriate, to sustain them, give a limiting or curative

instruction, or take other appropriate action.

 In our view, the experience or lack of experience with

firearms of an individual is relevant testimony in assessing

whether that individual acted recklessly in the use of a firearm.

On the whole, these questions and summation comments did not exceed

permissible bounds and do not constitute plain error that would

warrant reversal.

 We do note that any suggestion by the prosecutor that

defendant was guilty of violating department regulations and that

he acted as though the departmental rules did not apply to him

could be problematic. Such questions and comments should be

carefully framed to avoid any suggestion to the jury that defendant

should be convicted on his criminal charges for violating

departmental rules and regulations. If requested, an appropriate

limiting instruction should be considered. On the basis of this

record, however, where there was no objection and no request for

an instruction, we do not find a basis for reversal on this point.

 42 A-3262-15T4
 We need not address, beyond what we have already stated, the

argument in Point VI that the cumulative effect of the trial errors

denied defendant his right to due process and a fair trial, thus

warranting reversal.

 For the reasons stated in Part II of this opinion, defendant's

judgment of conviction is reversed, and the matter is remanded for

a new trial on Counts Two (knowing murder) and Three (aggravated

manslaughter).

 43 A-3262-15T4